**No. 23-1163**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

Rachel Creager Ireland, et al.,

Plaintiffs–Appellants,

v.

United States of America,

Defendant–Appellee.

On Appeal from a Final Order of the
United States District Court for the Western District of Texas
Case No. 1:21-cv-1049, Hon. Lee Yeakel

# BRIEF OF UNEMPLOYED WORKERS UNITED AS AMICUS CURIAE SUPPORTING APPELLANT AND REVERSAL

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for Amicus Curiae

Feb. 14, 2023

## CERTIFICATE OF INTEREST

The only entity represented in this *Amicus Curiae* brief is Unemployed Workers United, which is a project of Working Families Organization, Inc. and the State Democracy Project. Unemployed Workers United is the real party in interest for this brief. *Amicus* is a project of nonprofit organizations; it has no parent corporation, and no publicly held corporation owns any portion of any of it.

The only attorney to author this brief is undersigned counsel. Counsel represents *Amicus* for purposes of filing this brief. Unemployed Workers United appear for the first time in this proceeding as *Amicus Curiae* in this Court for the appeal.

Counsel knows of no other cases that will directly affect or be directly affected by the decision in this case.

/s/ Jim Davy

Jim Davy

## TABLE OF CONTENTS


**Page(s)**

Certificate of Interest....................................................................................i

Table of Authorities ....................................................................................... iii

Interests of the Amicus Curiae ......................................................................1

Introduction.....................................................................................................2

Argument.........................................................................................................4

I. PUA benefits provided a vital lifeline for low-wage workers at an especially precarious point, and early withdrawal of those benefits caused real harm. ..........................................................................................4

II. Recognizing the harms that come from losing access to unemployment benefits during a disaster, the federal government has previously allowed cross-state administration of benefits...........................................12

Conclusion .....................................................................................................16

Certificates ....................................................................................................1a

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cuccaro et al. v. DeSantis*,
No. CACE-21-14679 (17th Jud. Cir. Ct., Fla.) ........ 10

*D.A. et al. v. Hogan*,
No. 24-C-21-2988 (Baltimore City Cir. Ct., Md.) ........ 10, 12

*Unemployed Workers United v. Ducey*,
No. CV2021-14027 (Superior Ct. Ariz.) ........ 7, 10, 11, 12

**Statutes**

15 U.S.C. § 9021 ........ 14

15 U.S.C. § 9021(b) ........ 2

15 U.S.C. § 9021(c)(2) ........ 15

15 U.S.C. § 9021(d)(1)(A)(i) ........ 6

15 U.S.C. § 9021(f) ........ 15

15 U.S.C. §§ 9021(h)(1)-(2) ........ 15

**Other Authorities**

Aimee Picchi, *Gig workers to lose all unemployment benefits in 20 GOP states: "You can't prepare for it"*, CBS News (May 28, 2021) ........ 8

Andrew Stettner, *Fact Sheet: What's at Stake As States Cancel Federal Unemployment Benefits*, The Century Foundation (May 13, 2021) ........ 8, 9

Benefits.gov, Disaster Unemployment Assistance ........ 14

Center on Budget and Policy Priorities, Tracking the COVID-19 Economy's Effects on Food, Housing, and Employment Hardships (2021) ........ 6

Emily Stewart, *America's cruel unemployment experiment: Cutting of unemployment insurance early is all politics, not economics*, Vox Media (Jun. 7, 2021) ........ 8

Emma Pettit, Faculty Cuts Begin, With Warnings of More to Come, *The Chronicle of Higher Education*, May 15, 2020 ........ 5

Eric Kelderman, Major Cost-Cutting Begins in Response to Covid-19, With Faculty and Staff Furloughs and Pay Cuts, *The Chronicle of Higher Education*, Apr. 18, 2020 ........ 5

Jeremy Bauer-Wolf, CUNY faculty union sues system, saying adjunct cuts violate CARES Act, Education Dive, July 6, 2020 ........ 5

Joint Economic Committee, Local Economies Stand to Lose More than $12 Billion Due to Early Cancellation of Enhanced Unemployment Benefits (June 1, 2021) .. 9

Kenneth Terrell, *8 Occupations Hit Hardest by the Pandemic in 2020*, AARP (Jan. 11, 2021) ........ 5

Senate Approves Collins-Lieberman "Katrina Emergency Assistance Act," Senate Homeland Security and Governmental Affairs Committee (Feb. 16, 2006) ........ 14

U.S. Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey, Effects of the coronavirus COVID-19 pandemic ........ 5

**Page(s)**

U.S. Department of Labor, Unemployment Insurance Program Letter, No. 16-20, Change 1 .......... 6
U.S. Department of Labor, Unemployment Insurance Program Letter, No. 16-22 .... 6
U.S. Government Accountability Office, Report to Congressional Committees, Hurricanes Katrina and Rita (Feb. 2007) .......... 13, 14

## INTERESTS OF THE AMICUS CURIAE

**Unemployed Workers United** organizes with and advocates on behalf of unemployed, underemployed, and precariously employed workers across the Southern United States. UWU directly builds power from the grassroots up and encourages everyone to take action to change their living and working conditions to ensure dignity, access to healthcare, workplace safety, and income security. In the context of this case, UWU and its members and partners have direct personal experiences with the tremendous job losses that employers imposed—especially upon low-wage workers—at the outset of the COVID-19 pandemic; with the vital lifeline that Pandemic Unemployment Assistance provided to those workers when it existed; and with the incredible harms visited upon low-wage workers by many states' and the federal government's choices to end access to Congressionally-authorized and funded PUA earlier than set out in statute. The outcome of this case will affect UWU and many of its members, and accordingly, *Amicus* appreciates the Court's consideration of their perspective as it resolves this case.[1]

[1] *Amicus* files this brief with the consent of the Parties. No Party's counsel authored this brief in whole or in part. No Party or Party counsel contributed money intended to fund preparing or submitting the brief, nor did any other person or entity.

## INTRODUCTION

At some temporal remove, one might forget the widespread chaos and fear at the outset of the COVID-19 pandemic. One key manifestation of that fear was mass layoffs across economic sectors that shut down virtually overnight in March 2020. Many of those sectors employed primarily low-wage workers who could least afford the overnight loss of income. For those workers and their families, the loss of income has been a catastrophe—acute in the short term and altering their financial trajectories through the present day. Congress passed the American Rescue Plan—including, relevantly here, extended Pandemic Unemployment Assistance ("PUA")—specifically to ameliorate that harm. Recognizing the stakes, Congress said that the federal government "shall provide" PUA benefits to qualifying workers. 15 U.S.C. § 9021(b). For many laid-off low-wage workers, PUA benefits made the difference between eating and not, or staying housed and not, or maintaining access to health care and not. For a while, PUA worked as intended. But later—earlier than necessary, and apparently based upon fundamental misunderstanding of labor markets—some states refused to administer the PUA benefits that Congress obligated the federal government to provide to qualifying workers. Despite that obligation, the federal government took no action to fulfill its statutory mandate when those states stopped processing the benefits. As beneficial as PUA was to laid-off low-wage workers, the resulting withdrawal was a disaster. People suffered in the short term, and many low-wage workers struggle to this day to overcome the consequences of states' premature termination of PUA benefits, including collateral consequences

from evictions, exacerbated health problems from foregone medical treatment, and crushing debt.

That some states even had the option to unilaterally eliminate a benefit that Congress required the executive branch to provide to qualifying workers reflected discretionary choices about processing PUA benefits. The federal government decided that PUA would be processed by states for their own residents, using each state's existing unemployment benefits infrastructure. Crucially, the executive branch allowed no other method of disbursement, even when some states ceased to process them. By contrast, the executive branch has acted differently in prior situations where a state could not process unemployment benefits for its residents—in the Disaster Unemployment Assistance ("DUA") program, the Department of Labor has actively facilitated residents of one state obtaining benefits through the unemployment office of another state. This happened, for example, with Louisiana residents during the aftermath of Hurricane Katrina. Despite past cross-state facilitation, and the statutory mandate to get benefits to qualifying workers, PUA beneficiaries in numerous states simply had their benefits cut off early, with no recourse.

## ARGUMENT

### I. PUA benefits provided a vital lifeline for low-wage workers at an especially precarious point, and early withdrawal of those benefits caused real harm.

At the outset of the COVID-19 pandemic, employers oversaw mass layoffs that left millions of people without jobs virtually overnight. Many people who lost jobs—service industry workers, truck drivers and others in the supply chain, construction workers, and adjunct faculty, to give a few examples—already earned generally low wages and could least afford the overnight loss of income. The American Rescue Plan and the PUA program served as a vital lifeline for those workers, who lost jobs through no fault of their own. *Amicus*'s members have direct experience with PUA benefits, and how those benefits filled gaps in the social safety next through which they would otherwise have fallen. Similarly, when some states decided to end those benefits—even though funding had already been authorized and the statute directed the executive branch to provide it to qualifying workers— *Amicus*'s members acutely felt the ensuing privation. As it decides this case, *Amicus* urges the Court to consider the context of how and why Congress enacted PUA, how early implementation saved so many people from economic ruin, and how the chaotic and early end of PUA benefits undermined the program and harmed millions of people.

First, as important context, *Amicus* urges the Court to recall the context of the early pandemic. Millions of people lost jobs overnight. The Bureau of Labor Statistics reported that in May 2020, more than 49.8 million people reported that sometime in the preceding four weeks, they "had been unable to work . . . because their employer closed or lost business due to the coronavirus pandemic." U.S. Bureau of Labor

Statistics, Labor Force Statistics from the Current Population Survey, Effects of the coronavirus COVID-19 pandemic.[2] That burden fell especially heavily on people who already faced the most economic precarity. That included, as an example, people who worked part-time, who "were about twice as likely as full-time workers to have been unable to work due to the pandemic." *Id.* It also included people in lower-wage work, such as "people employed in service occupations," including "personal care" and "food preparation and serving," *id.*, support workers in other occupations, people working in travel and transportation, and construction (especially lower-paid non-union construction). *See* Kenneth Terrell, *8 Occupations Hit Hardest by the Pandemic in 2020*, AARP (Jan. 11, 2021).[3] Precarious, lower-wage professional work was included; the enrollment pressures that COVID-19 imposed on colleges, universities, and other higher education institutions fell on the shoulders of contingent faculty—who, without tenure protections, bore the first layoffs and cuts from colleges and institutions.[4] Those layoffs had predictable effects for those workers—even by the end

---

[2] *Available at*: https://www.bls.gov/cps/effects-of-the-coronavirus-covid-19-pandemic.htm.

[3] *Available at*: https://www.aarp.org/work/job-search/job-losses-during-covid/.

[4] *See, e.g.*, Eric Kelderman, Major Cost-Cutting Begins in Response to Covid-19, With Faculty and Staff Furloughs and Pay Cuts, *The Chronicle of Higher Education*, Apr. 18, 2020; Jeremy Bauer-Wolf, CUNY faculty union sues system, saying adjunct cuts violate CARES Act, Education Dive, July 6, 2020 (*available at*: https://www.educationdive.com/news/cuny-faculty-union-sues-system-saying-adjunct-cuts-violate-cares-act/581060/); Emma Pettit, Faculty Cuts Begin, With Warnings of More to Come, *The Chronicle of Higher Education*, May 15, 2020 ("While decisions were still up in the air, faculty members, especially those off the tenure track, feared that their ranks would be thinned. Now, those cuts are starting to be made across academe.").

of 2021, when jobs had begun to rebound, "20 million households report[ed] having too little to eat in the past seven days." Center on Budget and Policy Priorities, Tracking the COVID-19 Economy's Effects on Food, Housing, and Employment Hardships (2021).[5]

The PUA program itself exists because Congress passed the CARES Act to ameliorate exactly those hardships. The CARES Act created PUA to address a gap in the unemployment benefits safety net through which many people, including self-employed business owners, would otherwise have fallen. *E.g.* U.S. Department of Labor, Unemployment Insurance Program Letter, No. 16-22, at 2.[6] In creating PUA, the CARES Act generally relied upon the existing state unemployment benefits infrastructure, in both mechanics and delivery. *See, e.g.*, 15 U.S.C. § 9021(d)(1)(A)(i) ("[T]he amount of assistance shall be the Weekly Benefit Amount authorized under the unemployment compensation law of the state where the covered individual was employed."). The U.S. Department of Labor ("DOL") provided even more specific guidance on PUA, emphasizing the connection of the PUA program to the underlying state's unemployment compensation law. *See* U.S. Department of Labor, Unemployment Insurance Program Letter, No. 16-20, Change 1 (4/27/2020), Attachment I, at 4. The DOL emphasized that particular point in part because it's one of the differences between PUA and DUA.

---

[5] *Available at*: https://www.cbpp.org/research/poverty-and-inequality/tracking-the-covid-19-economys-effects-on-food-housing-and

[6] *Available at*: https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2022/UIPL%2016-22/UIPL%2016-22.pdf

Initially, the PUA worked exactly as intended to stem the worst hardships of people's job and income losses. Many of *Amicus*'s members can attest—and have attested under oath in various fora—to the life-changing effect of PUA. They have used PUA benefits uniformly for things like housing, food, medical care, utilities, and other necessary, non-negotiable expenses. Without the additional assistance, they could not have afforded those things. All the following stories come from attestations made under oath:

> "I have used my FPUC and PUA benefit to pay for rent, food for my children, travel to and from my son's doctor appointments which are 6 hours away, car payments, gas, utilities, internet, clothing and household essentials like toilet paper, hygiene products, laundry detergent and more."[7]
>
> "Prior to the COVID-19 pandemic, I worked full-time as a restaurant server. In April, 2020, I had my hours reduced from 40 hours a week to approximately 10 hours a week as a result of the COVID-19 pandemic. I used my [federal] benefits to pay for rent, food and clothes for my children, family transportation to school and work, household utilities and other bills."[8]
>
> "I have used my FPUC and PUA to pay for medications for my husband's Rheumatoid Arthritis, my electric bill, water bill, and other monthly expenses for myself and my family."[9]
>
> "I used my [federal benefits] to pay for utility bills, my car payment, car insurance payment, cell phone bill, internet payment, childcare, school materials for my son and rent. I am the only provider for my family."[10]

---

[7] *Unemployed Workers United v. Ducey*, No. CV2021-14027 (Superior Ct. Ariz.), Complaint, Ex. A (Declaration of Melody Salter).

[8] *Id.* Ex. B (Declaration of Steven Torres).

[9] *Id.* Ex. C (Declaration of Marcela Puente Huerta).

[10] *Id.* Ex. E (Declaration of Mitzy Jimenes Marquez).

Despite this, however, many states made the unilateral decision to stop processing federal PUA benefits months early, despite the federal government already having funded the program. States that made this decision often did so for stated reasons that did not stand up to economic scrutiny. *See* Emily Stewart, *America's cruel unemployment experiment: Cutting of unemployment insurance early is all politics, not economics*, Vox Media (Jun. 7, 2021).[11] The change not only stripped expanded benefits from traditional workers who qualified for state unemployment, but stripped gig economy workers—who received PUA but could not access regular state unemployment benefits—of the entire aid they had been receiving. *See, e.g.*, Aimee Picchi, *Gig workers to lose all unemployment benefits in 20 GOP states: "You can't prepare for it"*, CBS News (May 28, 2021).[12] And although states that made the change purported to do so to encourage people to go back to work, they did so at a moment when there were "only 8 million job openings as compared to 16 million jobless workers." Andrew Stettner, *Fact Sheet: What's at Stake As States Cancel Federal Unemployment Benefits*, The Century Foundation (May 13, 2021).[13]

That choice affected millions of people and the entire economy. Plaintiff-Appellants and *Amicus*'s members are hardly alone. Independent research determined that even just in the first eighteen states to end PUA (and MEUC and

---

[11] *Available at*: https://www.vox.com/policy-and-politics/2021/6/3/22465160/states-ending-unemployment-labor-shortage-texas.

[12] *Available at*: https://www.cbsnews.com/news/unemployment-benefits-gig-workers-republican-states/.

[13] *Available at*: https://tcf.org/content/commentary/fact-sheet-whats-stake-states-cancel-federal-unemployment-benefits/.

PEUC) early, the decision affected 2.2 million workers, depriving them of as much as $12.4 billion in benefits that Congress had said that the Secretary of Labor "shall provide" to them. What's at Stake, *supra*. Those cuts fell most heavily on workers of color, who were "hit the hardest by the pandemic" and had experienced a "leveling impact of federal programs" like PUA. *Id*. And ultimately, workers losing money not only affected them personally, but harmed the overall economic recovery because workers spending PUA and other federal unemployment benefits exerted a "stabilizing" effect on consumption. Joint Economic Committee, Local Economies Stand to Lose More than $12 Billion Due to Early Cancellation of Enhanced Unemployment Benefits (June 1, 2021).[14] And to be clear: although most states that ended PUA early simultaneously also ended Federal Pandemic Unemployment Compensation ("FPUC") and Pandemic Emergency Unemployment Compensation ("PEUC"), PUA made up a large share of total claims in each of those states—between 40% and 50% in states like Arkansas, Georgia, Indiana, and Montana, for example. *Id*.

At the personal level, as *Amici*'s members can attest (and have attested), the results were predictable and catastrophic. Among other issues, workers have attested under oath to numerous hardships upon losing PUA early:

> Becoming "unable to afford rent and facing eviction with my three children, inability to afford bills, food insecurity, anxiety, grief and debt," Salter Declaration, *supra*;

[14] *Available at*: d6b6396c-cbac-48e9-986f-20f589a3798a/fpuc-and-gop-govs-06.01.2021.pdf.

"The sudden loss of my [federal] benefits created immediate and substantial hardships in my life, including being unable to afford rent and facing eviction with my two children, inability to afford necessities like clothing for my children, food insecurity, and considerable daily stress. After my [federal] benefits were terminated, I resorted to donating plasma twice a week to obtain additional funds to support my family." Torres Declaration, *supra*;

"The loss of my [federal] benefits has resulted in immediate and severe hardship for my family and I. We are struggling to pay for my husband's medication and don't know if we will be able to afford his visit to the Mayo clinic later this month. My husband has not received his medication since July because we are unable to afford it. . . . [I have also been] unable to pay my electric bill, water bill, and credit card bills." Huerta Declaration, *supra*;

"The loss of federal benefits created immediate and substantial hardships in my life including being unable to pay my electric bill for three months and at risk of having my electricity turned off, at risk of losing my housing, unable to pay for enough food for my family, delaying my plans to go back to school, and causing me to start having to take anti-anxiety and anti-depressant medications due to the stress." Marquez Declaration, *supra*;

"Without federal coronavirus unemployment benefits, A.M. and his wife will be unable to pay their mortgage and may lose the home they have lived in for twenty years. Mr. Mitchell also suffers from diabetes and high blood pressure and will be unable to pay for his prescriptions, which will cause serious health consequences."[15]

Upon cessation of federal benefits, "[s]he has had to worry daily about eviction and her adult daughter and seven year old granddaughter were forced to move, out of her home, to Kentucky to a more secure living arrangement."[16]

Upon cessation of federal benefits, "[s]he has been unable to pay her real property taxes and now has a lien on her property."[17]

---

[15] *D.A. et al. v. Hogan*, No. 24-C-21-2988 (Baltimore City Cir. Ct., Md.), Complaint, at 6 (incorporating statements attested to under oath).

[16] *Cuccaro et al. v. DeSantis*, No. CACE-21-14679 (17th Jud. Cir. Ct., Fla.), Complaint, at 5.

[17] *Id*. at 5.

Notably, the withdrawal of PUA benefits even directly undermined the sole purported purpose of the states that did so. States believed that PUA benefits were preventing people from returning to work. But not only were PUA recipients actively looking without success, but their inability to pay cell phone and internet bills or make car payments undermined their ability to job search. And for people who tried to use time unemployed to continue education, cutting off PUA hurt people's ability to complete those programs, too. Workers have attested under oath to all of this:

> "The sudden loss of my [federal] benefits created immediate and substantial hardships in my life, including being unable to afford household essentials and pay for my credit card bills, electric bills, cell phone bill. Not having a phone or electricity will make it much harder for me to find work. Reinstatement of my [federal] benefits would allow me to pay phone, electric and credit card bills as well as finish my certificate program."[18]

> "I have actively continued to search for other jobs without success. I have submitted over 60 applications but have received no response. The came across a few positions that were comparable to my prior wage but required bilingual skills which I don't have time or money to obtain." *Id.*

> "I have applied for approximately 200 jobs and have had 4 phone interviews but have not been selected for any of the positions." Marquez Declaration, *supra.*

> "I continued to actively look for work online but have been unable to find work. I have submitted approximately 30 job applications since the end of 2020 and have received only one interview offer through text. When I replied to them, I never received a response back." Huerta Declaration, *supra.*

> "I have been unable to work full-time since March 2020, because of my health issues and because I cannot afford to fix my car. I always

---

[18] *Unemployed Workers United*, Complaint, *supra*, Ex. F (Declaration of Teresa Offield).

intended to go back to driving once the pandemic was over, but that has not been possible."[19]

"Without the federal coronavirus unemployment benefits, Mr. Baban and his family will lose their home and car, making it more difficult for him to find employment. Mr. Baban suffers anxiety and insomnia as a result of the decision to terminate federal benefits early."[20]

These stories are not unique. Although *Amici* have included here only statements made under oath, *Amici* have collected hundreds of similar stories, and all of those stories represent the millions of unemployed, under-employed, and precariously employed workers who have suffered exactly the same harms during the pandemic and after. *Amici* urge the Court to keep this context in mind as it considers this case.

## II. Recognizing the harms that come from losing access to unemployment benefits during a disaster, the federal government has previously allowed cross-state administration of benefits.

Unemployment benefits matter to everyone who received them, because they come at one of the most precarious moments of a worker's life. All involuntary job loss is precarious. But some contextual circumstances exacerbate the dislocation involuntary job already causes and affect people across the economy. For that reason, in other catastrophic situations in the past, the federal government has actively facilitated cross-state administration of unemployment benefits, including specifically for supplemental federal benefits. Those supplemental benefits, Disaster Unemployment Assistance ("DUA"), are specifically referenced in the provisions governing the PUA program. If anything, statutory differences between DUA and PUA only underscore why the federal government's willingness to facilitate cross-

[19] *Id.*, Ex. G (Declaration of Margo Newton).

[20] *Hogan*, Complaint, *supra*, at 7.

state administration of DUA benefits should have prompted it to have facilitated cross-state benefits administration of PUA in this context.

First, the federal government has previously facilitated cross-state administration of federally-funded unemployment benefits at a time of catastrophe for workers. In 2005, Hurricane Katrina ravaged the entire Gulf Coast and Mississippi Delta regions. Among the many, many problems: it simultaneously devastated employment and the economy overnight, especially in New Orleans, along the coast, and in other tourism-dependent parts of the region; and limited states'—especially Louisiana's and Mississippi's—ability to administer benefits. Because "Louisiana and Mississippi had always required in-office visits for filing [unemployment] claims," and the catastrophe closed those offices, Katrina essentially stopped those states from being able to process new unemployment claims in the wake of the hurricane. U.S. Government Accountability Office, Report to Congressional Committees, Hurricanes Katrina and Rita (Feb. 2007),[21] at 3. The Department of Labor "helped both states route calls from their residents to UI claims takers in other states with call centers," which allowed people who had lost their jobs because of Katrina to access benefits. *Id.*

Indeed, the federal government's intervention and assistance made that cross-state administration of benefits happen, and helped hundreds of thousands of people. Besides arranging for the cross-state benefits administration, "Access to federal contingency funds was also important for expediting services, and Congress and

[21] *Available at*: https://www.gao.gov/assets/gao-07-219.pdf.

agencies acted quickly to address immediate funding needs." *Id.* The federal government also authorized expanded DUA benefits when it became clear how long the Katrina recovery would take. *See*, *e.g.*, Senate Approves Collins-Lieberman "Katrina Emergency Assistance Act," Senate Homeland Security and Governmental Affairs Committee (Feb. 16, 2006) (discussing expansion of DUA from typical 26 weeks to 39 weeks, because of persistent post-Katrina unemployment).[22] All told, in a similar widespread catastrophe, with Congressionally-authorized supplemental unemployment benefits and states that were not processing claims, the federal government acted to facilitate cross-state benefits administration so that workers would get those benefits.

Second, especially in light of Congress's direction in the statute that the executive branch "shall provide" PUA to qualifying affected workers, the federal government should have acknowledged the efficacy of cross-state benefits administration. Having a situation where states were not administering federally-obligated benefits should have prompted the federal government to look to the Katrina precedent. PUA, like Katrina-era DUA, provides monetary assistance to people who lose jobs because of federally-declared disasters outside of their control, including particularly those who might not qualify for existing state UI benefits. *See, e.g.*, Benefits.gov, Disaster Unemployment Assistance;[23] *see also* 15 U.S.C. § 9021. PUA, like DUA, utilizes the existing infrastructure of state benefits administration agencies, rather than setting

---

[22] *Available at*: https://www.hsgac.senate.gov/media/majority-media/senate-approves-collins-lieberman-katrina-emergency-assistance-act/.

[23] *Available at*: https://www.benefits.gov/benefit/597.

up a relationship directly between unemployed workers and the federal government. *See* Disaster Unemployment Assistance, *supra*; *see also* 15 U.S.C. § 9021(f). And PUA, like DUA, recognizes that because of the duration of disasters of this magnitude, benefits might even need to last longer than typically. 15 U.S.C. § 9021(c)(2). Indeed, for these reasons, the statute that enacted PUA specifically looks to DUA for its structure, explicitly cross-referencing and requiring that "except as otherwise provided" elsewhere in the PUA statute, the DUA provisions apply as if:

> the term "COVID–19 public health emergency" were substituted for the term "major disaster" each place it appears in such part 625; and the term "pandemic" were substituted for the term "disaster" each place it appears in such part 625.

15 U.S.C. §§ 9021(h)(1)-(2).

If anything, the limited difference between PUA and DUA only underscore why the federal government should have looked to the Katrina precedent here. One of the few differences between PUA and DUA is the "shall" obligating language in PUA that does not exist in DUA. The government had on-point precedent in a prior situation where states were not administering federally-funded and -authorized DUA benefits, and the statute enacting those benefits lacked the specific directive of the CARES Act. If, there, the federal government provided encouragement, guidance, and monetary assistance to facilitate cross-state benefits administration, it could well have done that here, too. Especially considering the magnitude of the federally-declared disasters at issue, and in recognition of Congress's clear intent to get benefits to people who need them, the federal government should have facilitated cross-state administration here. Its failure to do so only harmed underemployed workers, like

*Amicus*'s members, at the most precarious time of their lives. *Amicus* urges this Court to account for past practice in analogous circumstances as it considers this case.

## CONCLUSION

For all of the foregoing reasons, in addition to the reasons discussed in Appellants' brief, the opinion of the District Court should be reversed, and the case should be reinstated.

Respectfully submitted,

/s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for Amicus Curiae

Feb. 14, 2023

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 3,717 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.66.1, set in Century Schoolbook 12-point type.

/s/ Jim Davy

Jim Davy

## CERTIFICATE OF SERVICE

I certify that on Feb 14, 2023, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jim Davy

Jim Davy